Exhibit 1



1325 G St. NW Suite 557 | Washington, DC 20005 | rightsanddissent.org | info@rightsanddissent.org

**August 27, 2021**

National Geospatial-Intelligence Agency
7500 GEOINT Drive
Springfield, VA 22150


To Whom It May Concern:

   This letter constitutes a request under the Freedom of Information Act, 5 U.S.C. § 552, et. seq and is submitted on behalf of Defending Rights & Dissent.

**Background**


On July 27, 2021, US Air Force Veteran Daniel Hale was sentenced to 45 months in prison under the Espionage Act.[1] Hale had given classified documents to a journalist who in turn published a series of stories about them with an online news publication. While neither the journalist nor the publication were named in the indictment the details described led observers to conclude journalist Jeremy Scahill and The Intercept were being referenced. During the sentencing hearing, Judge Liam O'Grady explicitly mentioned Jeremy Scahill and The Intercept by name, affirming what was already known given the facts laid out in court filings.

In August 2014, Daniel Hale's home was raided by the Federal Bureau of Investigation as part of an Espionage Act investigation. This investigation, per later Department of Justice press releases, was led by the FBI's Baltimore Field Office.[2] In spite of this raid, no

---

[1] *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Sentenced to 45 Months in Prison for Disclosing Classified Information to Reporter" (July 27, 2021). *Available at* https://www.justice.gov/opa/pr/former-intelligence-analyst-sentenced-45-months-prison-disclosing-classified-information
[2] *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Sentenced to 45 Months in Prison for Disclosing Classified Information to Reporter" (July 27, 2021). *Available at*

further public actions were taken by the government until May 2019, when the Department of Justice revealed a sealed indictment (dated March 2019).[3]

The reasons for the five year delay between the initial raid and an indictment is unknown. It is unclear if a decision was made not to charge Hale after the raid and that decision was later reversed, but a sentencing memo filed by Hale's defense at trial would indicate that was the case

According to the indictment,[4] Hale, while working as a Leidos contractor with the National Geospatial Intelligence Agency, printed five or six classified documents on February 28, 2014. Per the indictment, Hale then printed other documents in April, May, June, and August of 2014.

Per the government's indictment, the documents were published by a news outlet (unnamed in the indictment, but now known to be *The Intercept*) in July 2014, August 2014, April 2015, October 2015, December 2015, and December 2016.[5] Hale's case has been closely associated with "The Drone Papers," a series of exposes about the US's targeted killing program  published by *The Intercept* in October 2015. However, the earliest date of publication corresponds to a piece in *The Intercept* about the terror watchlist guidelines (one amicus brief filed in support of Hale at sentencing asserted that Hale had disclosed the nonclassified terror watchlist guidelines).

In addition to information after Hale's decision to print classified documents, the indictment contains information, including contents of correspondence, long predating Hale's printing of classified documents. It references searches Hale made on an NSA computer nearly one year before he is alleged to have leaked documents as an NGA contractor. It also references the contents of communications to or about a journalist (not named, but now known to be Jeremy Scahill).The earliest contents of a communication about the journalist excerpted in the indictment are from May 2013. The earliest content of a communication with the journalist is June 9, 2013. According to the same indictment, Hale did not begin printing classified documents not relevant to his work until February 2014.

---

https://www.justice.gov/opa/pr/former-intelligence-analyst-sentenced-45-months-prison-disclosing-classified-information

[3] *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Charged with Disclosing Classified Information" (May 9, 2019). *Available at* https://www.justice.gov/opa/pr/former-intelligence-analyst-charged-disclosing-classified-information

[4]  A copy of the indictment has been included as an appendix.
[5] This dates of publication are based off of a table on page 9 of the indictment. A copy of the indictment has been included as an appendix.

**Request**

We are requesting National Geospatial-Intelligence Agency records created from 2012 to 2021 that mentions or references[6]

- Leak investigations resulting from the Intercept publishing information about the US terror watch list in July and August 2014.
- Leak investigations resulting from The Intercept publishing classified information about the US drone program between April 2015 and December 2016
- The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency.
- "The Drone Papers" an October 2015 series of articles published by *The Intercept*
- *The Assassination Complex Inside the Government's Secret Drone Warfare Program*, a book published in 2017 based on aforementioned series of articles "The Drone Papers"

**Request for Fee Waiver**

Defending Rights & Dissent is a 501c3 nonprofit that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. Defending Rights & Dissent is a representative of the news media. The information requested is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government. Defending Rights & Dissent is entitled to a fee waiver.

Defending Rights & Dissent is the publisher of

- the Dissent NewsWire, an online publication that publishes original reporting about news pertaining to civil liberties,

- Reports, books, and other printed publications, including a 48 page report entitled *Still Spying on Dissent: The Enduring Problem of FBI First Amendment Abuse*,

---

[6] In a March 17, 2016 opinion a United States District Court for the District of Columbia Judge found requests for records "mentioning" or "referencing" a subject met FOIA's reasonable-description requirement. *See Shapiro v. CIA, No. 14-00019, 2016 WL 1069646 (D.D.C. Mar. 17, 2016) (Cooper, J.)*

- Audio and visual broadcasts, including *Still Spying,* a limited audio series about the history of the FBI and *Primary Sources*, an ongoing limited audio series about issues faced by national security whistleblowers and journalists.

Each of these items involves the gathering of information of potential interest to a segment of the public. Once that information is gathered, through the editorial skills of our staff the raw materials are transformed into distinct works, which we continue to distribute to audiences.

Defending Rights & Dissent has received an award from Project Censored for its original reporting and is a member of The Media Consortium.[7] In the past, Defending Rights & Dissent has produced original works based on information it has received through Freedom of Information Act requests, state level public records requests, or other similar requests.[8] Defending Rights & Dissent has engaged in extensive first hand reporting of the arrests and prosecutions of the Trump Inauguration protesters.[9]

---

[7] *See* "Why Is the FBI Harassing Activists in Cascadia?" *Defending Rights & Dissent*, January 5, 2015. Available at
https://rightsanddissent.org/news/why-is-the-fbi-harassing-activists-in-cascadia/

Member Directory, *The Media Consortium*. Available at
https://www.themediaconsortium.org/member-directory

[8] *See* "DRAD, DC NLG FOIA Request Uncovers That DC Police Spent Over $300,000 in Weapons, Ammunition to Use against Inauguration Day Protesters," *Defending Rights & Dissent*, October 30, 2017. Available at
https://rightsanddissent.org/news/drad-dg-nlg-foia-request-uncovers-dc-police-spent-300000-weapons-ammunition-use-inauguration-day-protesters/

"Who is Robert Wells and Why Did The FBI Consider Him A National Security Threat?" *Defending Rights & Dissent,* June 3, 2016. Available at
https://rightsanddissent.org/news/who-is-robert-wells-and-why-did-the-fbi-consider-him-a-national-security-threat/

"Senate Passes Bill Aimed at Silencing Pro-Palestinian Activism on Campuses," *Defending Rights & Dissent,* December 6, 2016. Available at
https://rightsanddissent.org/news/senate-passes-bill-aimed-silencing-pro-palestinian-speech-campuses/

[9] *See* Archive of J20 Articles, *Defending Rights & Dissent. Available at*
https://rightsanddissent.org/news/topics/free-speech-assembly/j20/

In the past, Defending Rights & Dissent when filing FOIA requests has repeatedly been designated  an educational institution, noncommercial scientific institution or representative of the news media requester.[10]

The requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government. Press freedom is a cornerstone of US democracy. When journalists publish classified information, how the government chooses to react has serious implications for press freedom.  Concerns about so-called "leak investigations," especially when they involve monitoring the communications of journalists, have aroused significant controversy within the media, complaints from press freedom groups, and concerns by members of Congress. The requested information pertains to a leak investigation in which the contents of communications between a journalist and source found their way into a criminal indictment. The length of time between the commencement of the investigation and a formal indictment have raised questions. That the long awaited indictment coincided with a change of administrations has led to speculation that a decision was made not to indict the leaker under one administration that was reversed for political purposes by a subsequent administration.

Rep. Ilhan Omar has publicly called for Daniel Hale to be pardoned for his role in the release of the Drone Papers, illustrating the public interest in this manner.

How the DOJ prosecutes, FBI investigates, and agencies like the NSA and NGA respond to the printing of classified information by a journalist is information that is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government.

**Conclusion**

In the event that we are denied a fee waiver, we are willing to pay up to $50 in costs for the reproduction of the records requested. Should the cost exceed $50 we ask to be contacted. Should any part of this request be withheld in whole or in part, we ask that specific statutory exemptions to disclosure be cited. Any part of this request is segregable.

---

[10] "Lawmaker wants pardon for Daniel Hale, who leaked drone secrets," *Washington Post* (August 26, 2021). *Available at* https://www.washingtonpost.com/local/legal-issues/daniel-hale-pardon-letter/2021/08/26/89ad149e-05c8-11ec-a266-7c7fe02fa374_story.html

We would prefer the records requested in electronic copy. Given precautions to halt the spread of the Coronavirus, Defending Rights & Dissent staff are currently not regularly in the office. Given the global pandemic, if possible we would prefer all records and communications should be sent electronically to Chip@RightsAndDissent.org. If for some reason records must be sent by mail please mail them to:

**Charles Gibbons**
**Policy Director**
**Defending Rights & Dissent**
**1325 G St. NW Suite 557**
**Washington, DC 20005**


Sincerely,

Charles Gibbons
Policy Director
Defending Rights & Dissent

Appendix

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**



FILED
IN OPEN COURT

2019

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:19-CR-59 |
| v. | Count 1: 18 U.S.C. § 793(c)<br>        Obtaining National Defense<br>        Information |
| DANIEL EVERETTE HALE, | Count 2: 18 U.S.C. § 793(e)<br>        Retention and Transmission<br>        of National Defense Information |
| *Defendant.* | Count 3: 18 U.S.C. § 793(e)<br>        Causing the Communication of<br>        National Defense Information |
|  | Count 4: 18 U.S.C. § 798(a)(3)<br>        Disclosure of Classified<br>        Communications Intelligence<br>        Information |
|  | Count 5: 18 U.S.C. § 641<br>        Theft of Government Property |

**INDICTMENT**

**March 2019 Term – At Alexandria**

THE GRAND JURY CHARGES THAT:

**GENERAL ALLEGATIONS**

A.   **The Defendant and His Access to Classified National Defense Information**

1.      Defendant DANIEL EVERETTE HALE, age 31, is a resident of Nashville,

Tennessee.

2.      From July 2009 through in or about July 2013, HALE was enlisted in the United

States Air Force, where after receiving language and intelligence training, he became a Language

Analyst. While serving on active duty, HALE was assigned to work at the National Security

Agency (NSA) from December 2011 to May 2013. HALE deployed in support of a Department

of Defense Joint Special Operations Task Force from March 2012 to August 2012, at Bagram

Airfield, Afghanistan, working for most of that time as an Intelligence Analyst responsible for

identifying, tracking, and targeting threat networks and targets. In connection with his active

duty service and work for NSA, HALE held a TOP SECRET//SENSITIVE

COMPARTMENTED INFORMATION (TS//SCI) security clearance, and had access to

classified national defense information.

3.     From December 2013 until August 2014, HALE was employed by a defense

contractor known as Leidos. While working for Leidos, HALE was assigned to the National

Geospatial-Intelligence Agency (NGA), in Springfield, Virginia, where he worked as a Political

Geography Analyst. HALE was required to receive and maintain a TOP SECRET//SCI security

clearance in order to work at NGA.

4.     Over his many years holding a security clearance, HALE received training

regarding classified information, including the definitions of classified information, the levels of

classification, and SCI, as well as the proper handling, marking, transportation, and storage of

classified materials. HALE received training on his duty to protect classified materials from

unauthorized disclosure, which included complying with handling, transportation, and storage

requirements. HALE knew that unauthorized removal and retention of classified materials and

transportation and storage of those materials in unauthorized locations risked disclosure and

transmission of those materials, and therefore could cause injury to the United States or be used

to the advantage of a foreign nation. In particular, HALE had been advised that the unauthorized

disclosure of TOP SECRET information reasonably could be expected to cause exceptionally

grave damage to the national security of the United States, and unauthorized disclosure of SECRET information reasonably could be expected to cause serious damage to the national security of the United States, and that violation of the rules governing the handling of classified information could result in criminal prosecution.

5.      HALE's work at NGA required the use of classified government computer systems and networks that provided access to classified national defense information. HALE was notified that these computers were monitored for "personnel misconduct (PM), law enforcement (LE), and counterintelligence (CI) investigations" by a banner that HALE had to acknowledge by clicking on the "OK" button every time he logged on to his computer.

6.      Because HALE held a security clearance and was assigned to NGA as a cleared defense contractor, the United States government entrusted HALE with access to closely held classified national defense information.

**B.      Background on Classified Information**

7.      Classified information is defined by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) as information in any form that (1) is owned by, produced by or for, or under the control of the United States government; (2) falls within one of more of the categories of information set forth in the order; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security that the original classification authority can identify and describe.

8.      Under Executive Order 13526, the designation SECRET (S) shall be applied to information, the unauthorized disclosure of which could reasonably be expected to cause serious damage to the national security.  The designation TOP SECRET (TS) shall be applied to information, the unauthorized disclosure of which could reasonably be expected to cause

exceptionally grave damage to national security.  NOFORN stands for "No Foreign Dissemination" and denotes that dissemination of that information is limited to United States persons.  ORCON stands for "Originator Controlled," which denotes that the information should not be further disseminated to any third party without the concurrence of the original classification authority.

9.      Executive Order No. 13526 also provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not sufficient to protect the information from unauthorized disclosure.  Special access programs pertaining to intelligence sources, methods, or analytical processes are called SCI programs.  One such SCI control system is SI information, which refers to "Special Intelligence."  SI protects information relating to technical and intelligence information derived from the monitoring of foreign communication signals by someone other than the intended recipients.  The term COMINT describes communications intelligence.

10.      Pursuant to Executive Order No. 13526, classified information can generally only be disclosed to those persons who have been granted an appropriate level United States government security clearance and who possess a valid need to know to perform a lawful and authorized government function.  Additionally, classified information only may be processed and retained in and on facilities approved for processing and storage at the appropriate classification level.  Classified information may not be removed from official premises without proper authorization.

C.    **HALE's Communications with an Online News Outlet**

11.    In April 2013, HALE used his unclassified NSA work computer to search the internet for information on a reporter (the Reporter). Among the results of his search was information pertaining to a scheduled appearance of the Reporter on or about April 29, 2013 at a Washington, D.C. restaurant/bookstore (Bookstore).

12.    On or about April 29, 2013, HALE attended a book tour event at the Bookstore, where he met with the Reporter. The next day, on or about April 30, 2013, HALE used his TOP SECRET NSA computer to search for classified information concerning individuals and issues about which the Reporter wrote.

13.    In May 2013, HALE sent a text to a close friend and confidant (Confidant) stating "[the Reporter] wants me to tell my story about working with drones at the opening screening of his documentary about the war and the use of drones."

14.    On or about June 8, 2013, HALE sat next to the Reporter at a public event at the Bookstore to promote the Reporter's book (Book 1). After the event, HALE texted a friend that he was then with the Reporter and headed to a restaurant.

15.    On or about June 9, 2013, the Reporter sent HALE an email with a link to an article about Edward Snowden in an online publication. That same day, Hale texted a friend that the previous night he had been hanging out with journalists who were focused on his story. Hale wrote that the evening's events might provide him with "life long connections with people who publish work like this."

16.    On or about July 14, 2013, HALE called the Reporter. Three days later, the Reporter sent HALE an email with the subject line, "did you try calling me?" The body of the email consisted of "I'm around." A few hours later, HALE called the Reporter again.

17.     On or about July 19, 2013, HALE sent a text message to the Confidant stating that he was going to New York to meet with the Reporter and two other journalists. The next day, the same day HALE separated from the Air Force, HALE sent an email to the Reporter stating he would take a train to New York City the following week. HALE told the Reporter he would text him when he arrived so they could determine where to meet. Later the same day, HALE emailed the Reporter about watching a "plug" about the Reporter's book on television. Attached to the email was a link to a news article entitled, "Court rules journalists can't keep their sources secret," about the Fourth Circuit Court of Appeals ruling that a "New York Times journalist . . . must testify in the trial of a former Central Intelligence Agency officer accused of leaking classified national defense information to the media."

18.     On or about July 23 and 24, 2013, HALE was in New York City.

19.     On or about July 25, 2013, HALE sent the Reporter an email with a copy of his resume attached and subject line, "Hale – unclass resume." The resume stated that HALE was looking for positions "within the Intelligence Community . . . [and was] [e]specially interested in Counter Terrorism, Counter Intelligence, Electronic Warfare, or stand up and maintenance of SIGINT oriented missions." HALE listed his "Active TS/SCI clearance & counter intelligence (CI) polygraph" and "4 years active duty Air Force" where he "[p]rocessed numerous documents critical to National Defense." As part of his duties as an Intelligence Analyst, HALE highlighted his experience operating "payloads on remotely piloted vehicles (RPV) used to support real-time kill/capture operations – over 1540 hours, over 200 specific mission" and his experience as a "[b]ack–up Intelligence De-confliction Officer for Operation Enduring Freedom's (OEF) intelligence, surveillance and reconnaissance (ISR) platforms – 80 hours, monitored 750 on-

going missions." Finally, HALE listed his experience working with original classification authorities to declassify information to be used against detainees in trial.

20.     On or about August 18, 2013, the Reporter called HALE. The call lasted approximately 35 minutes.

21.     On or about September 20, 2013, the Reporter asked HALE to "[j]ust set up a [Jabber] account [so] we can chat on encrypted." Jabber is a free instant messaging program that uses encryption to protect the content of the messages.

22.     In November 2013, HALE texted the Reporter to ask whether he would "be in D.C. this weekend for the anti drone summit."

23.     Between in and about September 20, 2013, and February 27, 2014, HALE and the Reporter had at least three encrypted conversations via Jabber.

**D.      HALE Prints Multiple Classified Documents Unrelated to His Assigned Work at NGA That Are Published by the Reporter's News Outlet**

24.     On or about February 27, 2014, HALE sent a text message to the Reporter asking, "Are you able to get on chat?"

25.     On or about February 28, 2014, HALE used a classified work computer assigned to him by NGA to print five documents marked as SECRET and one document marked as TOP SECRET, which were unrelated to his work at NGA.

26.     Approximately four hours after printing the six documents, HALE and the Reporter had the following conversation via text message:

    HALE:  Can you be here Monday?

    The Reporter:  Where?

    The Reporter:  I am out in LA for oscars. Back Tuesday.

    HALE:  Right, I understand, do you have time to stop by DC?

7

The Reporter:  Let me see if I can change flight.

HALE:  Please do and lemme know.

27.     Each of the six classified documents that HALE printed on February 28, 2014, was later published by the Reporter's Online News Outlet.

28.     HALE continued to print documents from his TOP SECRET computer unrelated to his work as an NGA contractor that were later published by the Reporter's Online News Outlet.

29.     While employed as a cleared defense contractor for NGA, HALE printed from his TOP SECRET computer 36 documents, including four duplicates.  Nine documents related to HALE's work at NGA, but 23 did not.

30.     Of the 23 documents unrelated to his work that he printed at NGA, HALE provided at least 17 to the Reporter and/or the Reporter's Online News Outlet, which published the documents in whole or in part.

31.     Eleven of the published documents were marked as SECRET or TOP SECRET (the Classified Documents).  Relevant original classification authorities have since determined that the documents were correctly marked at the appropriate classification level at the time they were printed, and that they remain classified at the same level today.

32.     The table displayed on the next page lists the 23 printed documents, unrelated to HALE's work at NGA, with the print job numbers assigned by NGA, the dates of printing, initial publication dates, and classifications:

| Document | NGA Print Job# | Date Printed | Date of Initial Publication | Classification |
|----------|----------------|--------------|-----------------------------|----------------|
| A | 10&11 | February 28, 2014 | October 2015 | SECRET |
| B | 12 | February 28, 2014 | October 2015 | SECRET |
| C | 13 | February 28, 2014 | October 2015 | SECRET |
| D | 14&15 | February 28, 2014 | October 2015 | SECRET |
| E | 16 | February 28, 2014 | October 2015 | TOP SECRET |
| F | 17 | February 28, 2014 | October 2015 | SECRET |
| G | 18 | April 3, 2014 | April 2015 | TOP SECRET |
| H | 19 | April 19, 2014 | N/A | TOP SECRET |
| I | 20 | April 20, 2014 | August 2014 | SECRET |
| J | 21 | April 20, 2014 | December 2015 | SECRET |
| K | 22 | April 20, 2014 | April 2015 | TOP SECRET |
| L | 23&24 | April 30, 2014 | July 2014 | UNCLASSIFIED |
| M | 25 | May 14, 2014 | August 2014 | SECRET |
| N | 26 | May 14, 2014 | August 2014 | UNCLASSIFIED |
| O | 27 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| P | 28 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| Q | 29 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| R | 30 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| S | 31 | June 20, 2014 | N/A | SECRET |
| T | 32 | June 27, 2014 | N/A | UNCLASSIFIED |
| U | 33 | July 31, 2014 | N/A | SECRET |
| V | 34 | August 5, 2014 | N/A | SECRET |
| W | 35&36 | August 5, 2014 | N/A | UNCLASSIFIED |

33.    The 11 Classified Documents that were published by the Reporter's Online News

Outlet, and later in a book authored by the Reporter, are described in further detail below:

- DOCUMENT A – A PowerPoint presentation on counterterrorism operations classified SECRET//SCI

- DOCUMENT B – A document describing a military campaign targeting Al-Qaeda overseas classified SECRET

- DOCUMENT C - A March 2013 PowerPoint on military operations classified SECRET

- DOCUMENT D – A PowerPoint presentation on counterterrorism operations classified SECRET

9

- **DOCUMENT E** – Information gathered by NSA on specific named targets classified TOP SECRET

- **DOCUMENT F** – A PowerPoint slide outlining the effects of the military campaign targeting Al-Qaeda overseas classified SECRET

- **DOCUMENT G** – PowerPoint presentation outlining U.S. military technical capabilities classified TOP SECRET

- **DOCUMENT I** – A report listing the accomplishments of an intelligence agency tasked with preventing terrorist attacks classified SECRET

- **DOCUMENT J** – A PowerPoint presentation classified SECRET

- **DOCUMENT K** – An intelligence report on an Al-Qaeda operative classified TOP SECRET

- **DOCUMENT M** – Information on the Terrorist Identities Datamart Environment classified SECRET

34.    HALE did not have a "need to know" the classified information contained in the 11 Classified Documents he printed.

35.    All of the Classified Documents HALE printed bore standard markings indicating they contained highly classified information of the United States, including SECRET, and TOP SECRET, as well as SCI, information.

36.    At the time HALE obtained the documents, he knew that they had been or would be obtained, taken, made, or disposed of unlawfully.

37.    HALE was never authorized to remove the Classified Documents from NGA and retain or transmit them, and neither the Reporter nor any of the employees at the Reporter's Online News Outlet were entitled to receive or possess them.

38.     The documents provided to the Reporter by HALE and published by the Reporter's Online News Outlet were compiled and published in a book authored by the Reporter (Book 2).

**E.     Evidence Stored in HALE's Home**

39.     On August 8, 2014, HALE possessed Document T on his home computer. HALE also possessed two thumb drives. The first thumb drive contained one page of Document A that HALE had attempted to delete. This page was marked "SECRET." The second thumb drive contained the "Tor" software and "Tails" operating system.

40.     Tor and Tails were recommended by the Reporter's Online News Outlet in an article published on the Reporter's Online News Outlet's website, which provided readers with instructions on how to anonymously "leak" documents to the Reporter's Online News Outlet. The article published by the Reporter's Online News Outlet explained that the Tor browser allows users to anonymously surf the web by "hiding your real IP address from the websites that you visit. If your network is being monitored, the eavesdroppers will only know that you are using Tor but not what you're doing." The article went on to explain that the Tails operating system, which can be installed via a USB stick, will prevent someone who has hacked into your computer from "spy[ing] on everything you do." It "strip[s] metadata from a variety of types of documents...[and] leaves no traces that it was ever run on your computer."

41.     On or about August 8, 2014, HALE's cell phone contact list included the contact information for the Reporter.

## COUNT 1
### (18 U.S.C. § 793(c)—Obtaining National Defense Information)

THE GRAND JURY FURTHER CHARGES THAT:

42.     The General Allegations within Paragraph 1 through 41 of this Indictment are re-alleged and incorporated by reference.

43.     Beginning on or about February 28, 2014, and continuing to on or about May 14, 2014, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, for the purpose of obtaining information respecting the national defense, unlawfully obtained documents connected with the national defense, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
| --- | --- | --- | --- |
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

knowing and having reason to believe at the time he obtained Documents A-G, I-K, and M that they had been or would be obtained, taken, made, or disposed of by any person contrary to the provisions of Title 18, United States Code, Chapter 37.

(In violation of Title 18, United States Code, Section 793(c).)

## COUNT 2
### (18 U.S.C. § 793(e)—Retention and Transmission of National Defense Information)

THE GRAND JURY FURTHER CHARGES THAT:

44.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

45.     Beginning on or about February 28, 2014, and continuing to on or about . December 17, 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, having unauthorized possession of, access to, and control over the following documents related to the national defense, willfully: (a) retained the documents and failed to deliver them to the officer or employee of the United States entitled to receive them; and (b) communicated, delivered, and transmitted such documents to a person not entitled to receive them.  Specifically, HALE retained the following documents relating to the national defense, and transmitted them to the Reporter and/or the Reporter's Online News Outlet:

| Document | Date Printed | Date of Initial Publication | Classification |
|---|---|---|---|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

(In violation of Title 18, United States Code, Section 793(e).)

**COUNT 3**
**(18 U.S.C. § 793(e)—Causing the Communication of National Defense Information)**

THE GRAND JURY FURTHER CHARGES THAT:

46.     The General Allegations within Paragraph 1 through 41 of this Indictment are

incorporated by reference.

47.     Beginning on or about February 28, 2014, and continuing to on or about

December 17, 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL

EVERETTE HALE, having unauthorized possession of, access to, and control over documents

related to the national defense of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|----------|--------------|-----------------------------|----------------|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

did willfully communicate, deliver, transmit and cause to be communicated, delivered, and

transmitted, and attempt to communicate, deliver and transmit and cause to be communicated,

delivered, and transmitted the same to persons not entitled to receive them, through the

publication, dissemination, and distribution to the general public of articles and books

concerning Classified Documents A-G, I-K, and M.

(In violation of Title 18, United States Code, Section 793(e).)

14

## COUNT 4
### (18 U.S.C. § 798(a)(3)—Disclosure of Classified Communication Intelligence Information)

THE GRAND JURY FURTHER CHARGES THAT:

48.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

49.     Beginning on or about February 28, 2014, and continuing to in or about October 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, did willfully communicate, furnish, transmit, and otherwise make available to an unauthorized person any classified information concerning the communication intelligence activities of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|----------|-------------|-----------------------------|----------------|
| A | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| K | February 28, 2014 | April 2015 | TOP SECRET |

(In violation of Title 18, United States Code, Sections 798(a)(3).)

## COUNT 5
### (18 U.S.C. § 641—Theft of Government Property)

THE GRAND JURY FURTHER CHARGES THAT:

50.    The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

51.    Between on or about February 28, 2014, and continuing to in or about December 2016, in the Eastern District of Virginia, and elsewhere, the defendant, DANIEL EVERETTE HALE, did knowingly and unlawfully steal and convert to his own use or the use of another, and without authority, conveyed and disposed of records and things of value of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|---|---|---|---|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| L | April 30, 2014 | July 2014 | UNCLASSIFIED |
| M | May 14, 2014 | August 2014 | SECRET |
| N | May 14, 2014 | August 2014 | UNCLASSIFIED |
| O | May 15, 2014 | December 2016 | UNCLASSIFIED |
| P | May 15, 2014 | December 2016 | UNCLASSIFIED |
| Q | May 15, 2014 | December 2016 | UNCLASSIFIED |
| R | May 15, 2014 | December 2016 | UNCLASSIFIED |
| T | June 27, 2014 | N/A | UNCLASSIFIED |

The aggregate value of said records and things of value being more than $1,000.

(All in violation of Title 18, United States Code, Section 641.)

16

A TRUE BILL:

UNDER SEAL

FOREPERSON OF THE GRAND JURY

G. Zachary Terwilliger                    John C. Demers
United States Attorney                    Assistant Attorney General
Eastern District of Virginia              National Security Division
                                          U.S. Department of Justice

Gordon D. Kromberg                        Heather M. Schmidt
Alexander P. Berrang                      Senior Trial Attorney
Assistant United States Attorneys         Counterintelligence-Export Control Section
                                          National Security Division
                                          U.S. Department of Justice

Exhibit 2

UNCLASSIFIED



**National Geospatial-Intelligence Agency**
**7500 GEOINT Drive**
**Springfield, Virginia 22150**

### FREEDOM OF INFORMATION (FOIA) ACKNOWLEDGEMENT-CLARIFICATION LETTER

**NGA-2021-FOI-00070**                                                    August 27, 2021

Dear Mr. Charles Gibbons:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request submitted to the National Geospatial-Intelligence Agency (NGA), received in the FOIA Requester Service Center on August 27, 2021. The number listed above has been assigned to identify your FOIA request.

The National Geospatial-Intelligence Agency, Freedom of Information Act office will furnish portions that may be released to the public. **However, NGA has a significant number of pending FOIA requests that prevents a response determination from being made within 20 workdays; thus, we have instituted multi-track processing of FOIA requests.** Based on the information you have provided, we have determined that your request should be placed in the below checked **(Multi-Track and Processing Category).**

**Multi-Track**
                    **X Complex**

*You Requested: "We are requesting National Geospatial-Intelligence Agency records created from 2012 to 2021 that mentions or references:*

*● Leak investigations resulting from the Intercept publishing information about the US terror watch list in July and August 2014.*
*● Leak investigations resulting from The Intercept publishing classified information about the US drone program between April 2015 and December 2016*
*● The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency.*
*● "The Drone Papers" an October 2015 series of articles published by The Intercept*
*● The Assassination Complex Inside the Government's Secret Drone Warfare Program, a book published in 2017 based on aforementioned series of articles "The Drone Papers""*

UNCLASSIFIED

UNCLASSIFIED
### ACKNOWLEDGEMENT- FREEDOM OF INFORMATION (FOIA) REQUEST

Processing this request will require us to coordinate our response with other office(s). The FOIA provides for the collection of fees based on the costs of processing a FOIA request. FOIA requesters are required to provide enough information to demonstrate which fee category is appropriate for their request.

**There are three (3) Fee Processing categories:**

( ) Commercial requesters should be willing to pay all search, review and duplication costs.

( ) Educational or Noncommercial Scientific Institution or News Media requesters should be willing to pay duplication charges in excess of 100 pages if more than 100 pages of records are desired.

( ) All other requesters should be willing to pay assessable search and duplication costs if more than two hours of search effort or 100 pages of records are desired.

**Applicable if checked:**

**(X)** You have indicated the maximum dollar amount you are willing to pay for this request is $50.00.

> ➤ *We will contact you prior to taking action on your request if the fees will exceed this amount.*

( ) The FOIA applies only to *existing* National Geospatial-Intelligence Agency records. *We are not obligated to create records*. If you would like us to take further action on your FOIA request, please provide additional information such as verification of dates and or location, etc.

( ) Please forward or fax verification of identity to accompany your request.

( ) Until you can provide additional information to clarify what NGA records might exist which are responsive to your P/A request, we cannot take any further action. *If we have not heard from you by (date), we will close your file.*

For any inquiries to our FOIA/PA office, please refer to FOIA case number **NGA-2021-FOI-00070** to assist us in responding to your request. Our telephone number is (571) 557-4141, and our fax number is (571) 558-3118.

Sincerely,

**NGA FOIA/PA REQUESTER SERVICE CENTER**

UNCLASSIFIED

## Fwd: [Non-DoD Source] FOIA Request.
1 message

---------- Forwarded message ---------
From: **Chip Gibbons** <chip@rightsanddissent.org>
Date: Thu, Jan 13, 2022 at 1:48 PM
Subject: Re: [Non-DoD Source] FOIA Request.
To: <FOIANGA@nga.mil>

Pursuant to 5 U.S.C. § 552(a)(7)(B)(ii), I request an estimated date of completion for NGA-2021-FOI-00070.

Thank you,

On Fri, Aug 27, 2021 at 12:02 PM <FOIANGA@nga.mil> wrote:

> Classification: UNCLASSIFIED
> ======================================================
>
> Good day Mr. Gibbons,
>
> Please see attached is your NGA Freedom of Information Act (FOIA) Acknowledgement Letter.  Your request is identified as NGA-2021-FOI-00070.
>
> Please feel free to contact us anytime for questions and/or concerns.
>
> Thank you.
>
> V/r
>
> NGA FOIA/PA Requester Service Center
>
>
> **From:** Chip Gibbons <chip@rightsanddissent.org>
> **Sent:** Friday, August 27, 2021 9:51 AM
> **To:** FOIANGA <FOIANGA@nga.mil>
> **Subject:** [Non-DoD Source] FOIA Request.

To whom it may concern.

Please see the attached FOIA request, which is being submitted on behalf of Defending Rights & Dissent

Thank you,

**Chip Gibbons**

**he/him/his**

**Policy Director**

**Defending Rights & Dissent**

**formerly Bill of Rights Defense Committee and Defending Dissent Foundation**

**(202) 552-7409**

**1325 G St. NW Suite 557**
**Washington, DC 20005**

**www.rightsanddissent.org**

================================================

Classification: UNCLASSIFIED

--
**Chip Gibbons**
**he/him/his**
**Policy Director**
**Defending Rights & Dissent**
**formerly Bill of Rights Defense Committee and Defending Dissent Foundation**
**(202) 552-7409**
**1325 G St. NW Suite 557**
**Washington, DC 20005**
**www.rightsanddissent.org**

Exhibit 4

---

## Fwd: [Non-DoD Source] FOIA Request.

---

---------- Forwarded message ---------
From: <FOIANGA@nga.mil>
Date: Thu, Jan 27, 2022 at 4:09 PM
Subject: RE: [URL Verdict: Neutral]Re: [Non-DoD Source] FOIA Request.
To: <chip@rightsanddissent.org>, <FOIANGA@nga.mil>

```
Classification: UNCLASSIFIED
=======================================================
```

Good day Mr. Gibbons,

Thank you for contacting our office.

The NGA FOIA team is working to respond to your request for Information:

> *"We are requesting National Geospatial-Intelligence Agency records created from 2012 to 2021 that mentions or references:*

>> ● *Leak investigations resulting from the Intercept publishing information about the US terror watch list in July and August 2014.*
>> ● *Leak investigations resulting from The Intercept publishing classified information about the US drone program between April 2015 and December 2016*
>> ● *The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency.*
>> ● *"The Drone Papers" an October 2015 series of articles published by The Intercept*
>> ● *The Assassination Complex Inside the Government's Secret Drone Warfare Program, a book published in 2017 based on aforementioned series of*

*articles "The Drone Papers"*

We estimate 15 days to complete your request.  Should processing continue beyond this estimation, we will provide you status updates until completed.  We appreciate your patience.  Please let us know if you have any question at any time.

[Quoted text hidden]
[Quoted text hidden]

Exhibit 5



1325 G St. NW Suite 557 | Washington, DC 20005 | rightsanddissent.org | info@rightsanddissent.org

**August 27, 2021**

Federal Bureau of Investigation
***Attn: FOI/PA Request***
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843
Fax: (540) 868-4391/4997

To Whom It May Concern:

This letter constitutes a request under the Freedom of Information Act, 5 U.S.C. § 552, et. seq and is submitted on behalf of Defending Rights & Dissent.

**Background**

On July 27, 2021, US Air Force Veteran Daniel Hale was sentenced to 45 months in prison under the Espionage Act.[1] Hale had given classified documents to a journalist who in turn published a series of stories about them with an online news publication. While neither the journalist nor the publication were named in the indictment the details described led observers to conclude journalist Jeremy Scahill and The Intercept were being referenced. During the sentencing hearing, Judge Liam O'Grady explicitly mentioned Jeremy Scahill and The Intercept by name, affirming what was already known given the facts laid out in court filings.

In August 2014, Daniel Hale's home was raided by the Federal Bureau of Investigation as part of an Espionage Act investigation. This investigation, per later Department of Justice

---

[1] *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Sentenced to 45 Months in Prison for Disclosing Classified Information to Reporter" (July 27, 2021). *Available at* https://www.justice.gov/opa/pr/former-intelligence-analyst-sentenced-45-months-prison-disclosing-classified-information

press releases, was led by the FBI's Baltimore Field Office.[2] In spite of this raid, no further public actions were taken by the government until May 2019, when the Department of Justice revealed a sealed indictment (dated March 2019).[3]

The reasons for the five year delay between the initial raid and an indictment is unknown. It is unclear if a decision was made not to charge Hale after the raid and that decision was later reversed, but a sentencing memo filed by Hale's defense at trial would indicate that was the case

According to the indictment,[4] Hale, while working as a Leidos contractor with the National Geospatial Intelligence Agency, printed five or six classified documents on February 28, 2014. Per the indictment, Hale then printed other documents in April, May, June, and August of 2014.

Per the government's indictment, the documents were published by a news outlet (unnamed in the indictment, but now known to be *The Intercept*) in July 2014, August 2014, April 2015, October 2015, December 2015, and December 2016.[5] Hale's case has been closely associated with "The Drone Papers," a series of exposes about the US's targeted killing program  published by *The Intercept* in October 2015. However, the earliest date of publication corresponds to a piece in *The Intercept* about the terror watchlist guidelines (one amicus brief filed in support of Hale at sentencing asserted that Hale had disclosed the nonclassified terror watchlist guidelines).

In addition to information after Hale's decision to print classified documents, the indictment contains information, including contents of correspondence, long predating Hale's printing of classified documents. It references searches Hale made on an NSA computer nearly one year before he is alleged to have leaked documents as an NGA contractor. It also references the contents of communications to or about a journalist (not named, but now known to be Jeremy Scahill).The earliest contents of a communication about the journalist excerpted in the indictment are from May 2013. The earliest content of a communication with the journalist is June 9, 2013. According to the same

---

[2]  *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Sentenced to 45 Months in Prison for Disclosing Classified Information to Reporter" (July 27, 2021). *Available at* https://www.justice.gov/opa/pr/former-intelligence-analyst-sentenced-45-months-prison-disclosing-classified-information

[3] *See* Department of Justice Office of Public Affairs, "Former Intelligence Analyst Charged with Disclosing Classified Information" (May 9, 2019). *Available at* https://www.justice.gov/opa/pr/former-intelligence-analyst-charged-disclosing-classified-information

[4]  A copy of the indictment has been included as an appendix.
[5] This dates of publication are based off of a table on page 9 of the indictment. A copy of the indictment has been included as an appendix.

indictment, Hale did not begin printing classified documents not relevant to his work until February 2014.

## Request

We are requesting FBI records created from 2012 to 2021 that mentions or references[6]

- Leak investigations resulting from the Intercept publishing information about the US terror watch list in July and August 2014.
- Leak investigations resulting from The Intercept publishing classified information about the US drone program between April 2015 and December 2016
- The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency.
- "The Drone Papers" an October 2015 series of articles published by *The Intercept*
- *The Assassination Complex Inside the Government's Secret Drone Warfare Program*, a book published in 2017 based on aforementioned series of articles "The Drone Papers"

## Request for Fee Waiver

Defending Rights & Dissent is a 501c3 nonprofit that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. Defending Rights & Dissent is a representative of the news media. The information requested is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government. Defending Rights & Dissent is entitled to a fee waiver.

Defending Rights & Dissent is the publisher of

- the Dissent NewsWire, an online publication that publishes original reporting about news pertaining to civil liberties,

- Reports, books, and other printed publications, including a 48 page report entitled *Still Spying on Dissent: The Enduring Problem of FBI First Amendment Abuse*,

---

[6] In a March 17, 2016 opinion a United States District Court for the District of Columbia Judge found requests for records "mentioning" or "referencing" a subject met FOIA's reasonable-description requirement. *See Shapiro v. CIA, No. 14-00019, 2016 WL 1069646 (D.D.C. Mar. 17, 2016) (Cooper, J.)*

- Audio and visual broadcasts, including *Still Spying,* a limited audio series about the history of the FBI and *Primary Sources*, an ongoing limited audio series about issues faced by national security whistleblowers and journalists.

Each of these items involves the gathering of information of potential interest to a segment of the public. Once that information is gathered, through the editorial skills of our staff the raw materials are transformed into distinct works, which we continue to distribute to audiences.

Defending Rights & Dissent has received an award from Project Censored for its original reporting and is a member of The Media Consortium.[7] In the past, Defending Rights & Dissent has produced original works based on information it has received through Freedom of Information Act requests, state level public records requests, or other similar requests.[8] Defending Rights & Dissent has engaged in extensive first hand reporting of the arrests and prosecutions of the Trump Inauguration protesters.[9]

---

[7] *See* "Why Is the FBI Harassing Activists in Cascadia?" *Defending Rights & Dissent*, January 5, 2015. Available at
https://rightsanddissent.org/news/why-is-the-fbi-harassing-activists-in-cascadia/

Member Directory, *The Media Consortium*. Available at
https://www.themediaconsortium.org/member-directory

[8] *See* "DRAD, DC NLG FOIA Request Uncovers That DC Police Spent Over $300,000 in Weapons, Ammunition to Use against Inauguration Day Protesters," *Defending Rights & Dissent*, October 30, 2017. Available at
https://rightsanddissent.org/news/drad-dg-nlg-foia-request-uncovers-dc-police-spent-300000-weapons-ammunition-use-inauguration-day-protesters/

"Who is Robert Wells and Why Did The FBI Consider Him A National Security Threat?" *Defending Rights & Dissent,* June 3, 2016. Available at
https://rightsanddissent.org/news/who-is-robert-wells-and-why-did-the-fbi-consider-him-a-national-security-threat/

"Senate Passes Bill Aimed at Silencing Pro-Palestinian Activism on Campuses," *Defending Rights & Dissent,* December 6, 2016. Available at
https://rightsanddissent.org/news/senate-passes-bill-aimed-silencing-pro-palestinian-speech-campuses/

[9] *See* Archive of J20 Articles, *Defending Rights & Dissent. Available at*
https://rightsanddissent.org/news/topics/free-speech-assembly/j20/

In the past, Defending Rights & Dissent when filing FOIA requests has repeatedly been designated  an educational institution, noncommercial scientific institution or representative of the news media requester.[10]

The requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government. Press freedom is a cornerstone of US democracy. When journalists publish classified information, how the government chooses to react has serious implications for press freedom.  Concerns about so-called "leak investigations," especially when they involve monitoring the communications of journalists, have aroused significant controversy within the media, complaints from press freedom groups, and concerns by members of Congress. The requested information pertains to a leak investigation in which the contents of communications between a journalist and source found their way into a criminal indictment. The length of time between the commencement of the investigation and a formal indictment have raised questions. That the long awaited indictment coincided with a change of administrations has led to speculation that a decision was made not to indict the leaker under one administration that was reversed for political purposes by a subsequent administration.

Rep. Ilhan Omar has publicly called for Daniel Hale to be pardoned for his role in the release of the Drone Papers, illustrating the public interest in this manner.

How the DOJ prosecutes, FBI investigates, and agencies like the NSA and NGA respond to the printing of classified information by a journalist is information that is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government.

**Conclusion**

In the event that we are denied a fee waiver, we are willing to pay up to $50 in costs for the reproduction of the records requested. Should the cost exceed $50 we ask to be contacted. Should any part of this request be withheld in whole or in part, we ask that specific statutory exemptions to disclosure be cited. Any part of this request is segregable.

---

[10] "Lawmaker wants pardon for Daniel Hale, who leaked drone secrets," *Washington Post* (August 26, 2021). *Available at* https://www.washingtonpost.com/local/legal-issues/daniel-hale-pardon-letter/2021/08/26/89ad1 49e-05c8-11ec-a266-7c7fe02fa374_story.html

We would prefer the records requested in electronic copy. Given precautions to halt the spread of the Coronavirus, Defending Rights & Dissent staff are currently not regularly in the office. Given the global pandemic, if possible we would prefer all records and communications should be sent electronically to  Chip@RightsAndDissent.org. If for some reason records must be sent by mail please mail them to:

**Charles Gibbons**
**Policy Director**
**Defending Rights & Dissent**
**1325 G St. NW Suite 557**
**Washington, DC 20005**


Sincerely,

Charles Gibbons
Policy Director
Defending Rights & Dissent

Appendix

# UNDER SEAL



FILED
IN OPEN COURT

2019

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:19-CR-59 |
| v. | Count 1: 18 U.S.C. § 793(c)<br>Obtaining National Defense Information |
| DANIEL EVERETTE HALE, | |
| *Defendant.* | Count 2: 18 U.S.C. § 793(e)<br>Retention and Transmission of National Defense Information |
| | Count 3: 18 U.S.C. § 793(e)<br>Causing the Communication of National Defense Information |
| | Count 4: 18 U.S.C. § 798(a)(3)<br>Disclosure of Classified Communications Intelligence Information |
| | Count 5: 18 U.S.C. § 641<br>Theft of Government Property |

## INDICTMENT

### March 2019 Term – At Alexandria

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

**A.    The Defendant and His Access to Classified National Defense Information**

1.    Defendant DANIEL EVERETTE HALE, age 31, is a resident of Nashville, Tennessee.

2.    From July 2009 through in or about July 2013, HALE was enlisted in the United States Air Force, where after receiving language and intelligence training, he became a Language

Analyst. While serving on active duty, HALE was assigned to work at the National Security

Agency (NSA) from December 2011 to May 2013. HALE deployed in support of a Department

of Defense Joint Special Operations Task Force from March 2012 to August 2012, at Bagram

Airfield, Afghanistan, working for most of that time as an Intelligence Analyst responsible for

identifying, tracking, and targeting threat networks and targets. In connection with his active

duty service and work for NSA, HALE held a TOP SECRET//SENSITIVE

COMPARTMENTED INFORMATION (TS//SCI) security clearance, and had access to

classified national defense information.

     3.     From December 2013 until August 2014, HALE was employed by a defense

contractor known as Leidos. While working for Leidos, HALE was assigned to the National

Geospatial-Intelligence Agency (NGA), in Springfield, Virginia, where he worked as a Political

Geography Analyst. HALE was required to receive and maintain a TOP SECRET//SCI security

clearance in order to work at NGA.

     4.     Over his many years holding a security clearance, HALE received training

regarding classified information, including the definitions of classified information, the levels of

classification, and SCI, as well as the proper handling, marking, transportation, and storage of

classified materials. HALE received training on his duty to protect classified materials from

unauthorized disclosure, which included complying with handling, transportation, and storage

requirements. HALE knew that unauthorized removal and retention of classified materials and

transportation and storage of those materials in unauthorized locations risked disclosure and

transmission of those materials, and therefore could cause injury to the United States or be used

to the advantage of a foreign nation. In particular, HALE had been advised that the unauthorized

disclosure of TOP SECRET information reasonably could be expected to cause exceptionally

2

grave damage to the national security of the United States, and unauthorized disclosure of

SECRET information reasonably could be expected to cause serious damage to the national

security of the United States, and that violation of the rules governing the handling of classified

information could result in criminal prosecution.

5.      HALE's work at NGA required the use of classified government computer

systems and networks that provided access to classified national defense information.  HALE

was notified that these computers were monitored for "personnel misconduct (PM), law

enforcement (LE), and counterintelligence (CI) investigations" by a banner that HALE had to

acknowledge by clicking on the "OK" button every time he logged on to his computer.

6.      Because HALE held a security clearance and was assigned to NGA as a cleared

defense contractor, the United States government entrusted HALE with access to closely held

classified national defense information.

**B.      Background on Classified Information**

7.      Classified information is defined by Executive Order 13526, 75 Fed. Reg. 707

(Jan. 5, 2010) as information in any form that (1) is owned by, produced by or for, or under the

control of the United States government; (2) falls within one of more of the categories of

information set forth in the order; and (3) is classified by an original classification authority who

determines that its unauthorized disclosure reasonably could be expected to result in damage to

the national security that the original classification authority can identify and describe.

8.      Under Executive Order 13526, the designation SECRET (S) shall be applied to

information, the unauthorized disclosure of which could reasonably be expected to cause serious

damage to the national security.  The designation TOP SECRET (TS) shall be applied to

information, the unauthorized disclosure of which could reasonably be expected to cause

exceptionally grave damage to national security. NOFORN stands for "No Foreign Dissemination" and denotes that dissemination of that information is limited to United States persons. ORCON stands for "Originator Controlled," which denotes that the information should not be further disseminated to any third party without the concurrence of the original classification authority.

9.    Executive Order No. 13526 also provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not sufficient to protect the information from unauthorized disclosure. Special access programs pertaining to intelligence sources, methods, or analytical processes are called SCI programs. One such SCI control system is SI information, which refers to "Special Intelligence." SI protects information relating to technical and intelligence information derived from the monitoring of foreign communication signals by someone other than the intended recipients. The term COMINT describes communications intelligence.

10.    Pursuant to Executive Order No. 13526, classified information can generally only be disclosed to those persons who have been granted an appropriate level United States government security clearance and who possess a valid need to know to perform a lawful and authorized government function. Additionally, classified information only may be processed and retained in and on facilities approved for processing and storage at the appropriate classification level. Classified information may not be removed from official premises without proper authorization.

C.    **HALE's Communications with an Online News Outlet**

11.    In April 2013, HALE used his unclassified NSA work computer to search the internet for information on a reporter (the Reporter).  Among the results of his search was information pertaining to a scheduled appearance of the Reporter on or about April 29, 2013 at a Washington, D.C. restaurant/bookstore (Bookstore).

12.    On or about April 29, 2013, HALE attended a book tour event at the Bookstore, where he met with the Reporter.  The next day, on or about April 30, 2013, HALE used his TOP SECRET NSA computer to search for classified information concerning individuals and issues about which the Reporter wrote.

13.    In May 2013, HALE sent a text to a close friend and confidant (Confidant) stating "[the Reporter] wants me to tell my story about working with drones at the opening screening of his documentary about the war and the use of drones."

14.    On or about June 8, 2013, HALE sat next to the Reporter at a public event at the Bookstore to promote the Reporter's book (Book 1).  After the event, HALE texted a friend that he was then with the Reporter and headed to a restaurant.

15.    On or about June 9, 2013, the Reporter sent HALE an email with a link to an article about Edward Snowden in an online publication.  That same day, Hale texted a friend that the previous night he had been hanging out with journalists who were focused on his story.  Hale wrote that the evening's events might provide him with "life long connections with people who publish work like this."

16.    On or about July 14, 2013, HALE called the Reporter.  Three days later, the Reporter sent HALE an email with the subject line, "did you try calling me?"  The body of the email consisted of "I'm around."  A few hours later, HALE called the Reporter again.

17.     On or about July 19, 2013, HALE sent a text message to the Confidant stating that

he was going to New York to meet with the Reporter and two other journalists.  The next day,

the same day HALE separated from the Air Force, HALE sent an email to the Reporter stating he

would take a train to New York City the following week.  HALE told the Reporter he would text

him when he arrived so they could determine where to meet.  Later the same day, HALE emailed

the Reporter about watching a "plug" about the Reporter's book on television.  Attached to the

email was a link to a news article entitled, "Court rules journalists can't keep their sources

secret," about the Fourth Circuit Court of Appeals ruling that a "New York Times

journalist . . . must testify in the trial of a former Central Intelligence Agency officer accused of

leaking classified national defense information to the media."

18.     On or about July 23 and 24, 2013, HALE was in New York City.

19.     On or about July 25, 2013, HALE sent the Reporter an email with a copy of his

resume attached and subject line, "Hale – unclass resume."  The resume stated that HALE was

looking for positions "within the Intelligence Community . . . [and was] [e]specially interested in

Counter Terrorism, Counter Intelligence, Electronic Warfare, or stand up and maintenance of

SIGINT oriented missions."  HALE listed his "Active TS/SCI clearance & counter intelligence

(CI) polygraph" and "4 years active duty Air Force" where he "[p]rocessed numerous documents

critical to National Defense."  As part of his duties as an Intelligence Analyst, HALE highlighted

his experience operating "payloads on remotely piloted vehicles (RPV) used to support real-time

kill/capture operations – over 1540 hours, over 200 specific mission" and his experience as a

"[b]ack–up Intelligence De-confliction Officer for Operation Enduring Freedom's (OEF)

intelligence, surveillance and reconnaissance (ISR) platforms – 80 hours, monitored 750 on-

going missions." Finally, HALE listed his experience working with original classification authorities to declassify information to be used against detainees in trial.

20.     On or about August 18, 2013, the Reporter called HALE. The call lasted approximately 35 minutes.

21.     On or about September 20, 2013, the Reporter asked HALE to "[j]ust set up a [Jabber] account [so] we can chat on encrypted." Jabber is a free instant messaging program that uses encryption to protect the content of the messages.

22.     In November 2013, HALE texted the Reporter to ask whether he would "be in D.C. this weekend for the anti drone summit."

23.     Between in and about September 20, 2013, and February 27, 2014, HALE and the Reporter had at least three encrypted conversations via Jabber.

**D.      HALE Prints Multiple Classified Documents Unrelated to His Assigned Work at NGA That Are Published by the Reporter's News Outlet**

24.     On or about February 27, 2014, HALE sent a text message to the Reporter asking, "Are you able to get on chat?"

25.     On or about February 28, 2014, HALE used a classified work computer assigned to him by NGA to print five documents marked as SECRET and one document marked as TOP SECRET, which were unrelated to his work at NGA.

26.     Approximately four hours after printing the six documents, HALE and the Reporter had the following conversation via text message:

> HALE: Can you be here Monday?
>
> The Reporter: Where?
>
> The Reporter: I am out in LA for oscars. Back Tuesday.
>
> HALE: Right, I understand, do you have time to stop by DC?

The Reporter:  Let me see if I can change flight.

HALE:  Please do and lemme know.

27.     Each of the six classified documents that HALE printed on February 28, 2014, was later published by the Reporter's Online News Outlet.

28.     HALE continued to print documents from his TOP SECRET computer unrelated to his work as an NGA contractor that were later published by the Reporter's Online News Outlet.

29.     While employed as a cleared defense contractor for NGA, HALE printed from his TOP SECRET computer 36 documents, including four duplicates.  Nine documents related to HALE's work at NGA, but 23 did not.

30.     Of the 23 documents unrelated to his work that he printed at NGA, HALE provided at least 17 to the Reporter and/or the Reporter's Online News Outlet, which published the documents in whole or in part.

31.     Eleven of the published documents were marked as SECRET or TOP SECRET (the Classified Documents).  Relevant original classification authorities have since determined that the documents were correctly marked at the appropriate classification level at the time they were printed, and that they remain classified at the same level today.

32.     The table displayed on the next page lists the 23 printed documents, unrelated to HALE's work at NGA, with the print job numbers assigned by NGA, the dates of printing, initial publication dates, and classifications:

| Document | NGA Print Job# | Date Printed | Date of Initial Publication | Classification |
|----------|---------------|--------------|----------------------------|----------------|
| A | 10&11 | February 28, 2014 | October 2015 | SECRET |
| B | 12 | February 28, 2014 | October 2015 | SECRET |
| C | 13 | February 28, 2014 | October 2015 | SECRET |
| D | 14&15 | February 28, 2014 | October 2015 | SECRET |
| E | 16 | February 28, 2014 | October 2015 | TOP SECRET |
| F | 17 | February 28, 2014 | October 2015 | SECRET |
| G | 18 | April 3, 2014 | April 2015 | TOP SECRET |
| H | 19 | April 19, 2014 | N/A | TOP SECRET |
| I | 20 | April 20, 2014 | August 2014 | SECRET |
| J | 21 | April 20, 2014 | December 2015 | SECRET |
| K | 22 | April 20, 2014 | April 2015 | TOP SECRET |
| L | 23&24 | April 30, 2014 | July 2014 | UNCLASSIFIED |
| M | 25 | May 14, 2014 | August 2014 | SECRET |
| N | 26 | May 14, 2014 | August 2014 | UNCLASSIFIED |
| O | 27 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| P | 28 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| Q | 29 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| R | 30 | May 15, 2014 | December 2016 | UNCLASSIFIED |
| S | 31 | June 20, 2014 | N/A | SECRET |
| T | 32 | June 27, 2014 | N/A | UNCLASSIFIED |
| U | 33 | July 31, 2014 | N/A | SECRET |
| V | 34 | August 5, 2014 | N/A | SECRET |
| W | 35&36 | August 5, 2014 | N/A | UNCLASSIFIED |

33.     The 11 Classified Documents that were published by the Reporter's Online News

Outlet, and later in a book authored by the Reporter, are described in further detail below:

- DOCUMENT A – A PowerPoint presentation on counterterrorism operations classified SECRET//SCI

- DOCUMENT B – A document describing a military campaign targeting Al-Qaeda overseas classified SECRET

- DOCUMENT C - A March 2013 PowerPoint on military operations classified SECRET

- DOCUMENT D – A PowerPoint presentation on counterterrorism operations classified SECRET

9

- <u>DOCUMENT E</u> – Information gathered by NSA on specific named targets classified TOP SECRET

- <u>DOCUMENT F</u> – A PowerPoint slide outlining the effects of the military campaign targeting Al-Qaeda overseas classified SECRET

- <u>DOCUMENT G</u> – PowerPoint presentation outlining U.S. military technical capabilities classified TOP SECRET

- <u>DOCUMENT I</u> – A report listing the accomplishments of an intelligence agency tasked with preventing terrorist attacks classified SECRET

- <u>DOCUMENT J</u> – A PowerPoint presentation classified SECRET

- <u>DOCUMENT K</u> – An intelligence report on an Al-Qaeda operative classified TOP SECRET

- <u>DOCUMENT M</u> – Information on the Terrorist Identities Datamart Environment classified SECRET

34.     HALE did not have a "need to know" the classified information contained in the 11 Classified Documents he printed.

35.     All of the Classified Documents HALE printed bore standard markings indicating they contained highly classified information of the United States, including SECRET, and TOP SECRET, as well as SCI, information.

36.     At the time HALE obtained the documents, he knew that they had been or would be obtained, taken, made, or disposed of unlawfully.

37.     HALE was never authorized to remove the Classified Documents from NGA and retain or transmit them, and neither the Reporter nor any of the employees at the Reporter's Online News Outlet were entitled to receive or possess them.

38.     The documents provided to the Reporter by HALE and published by the Reporter's Online News Outlet were compiled and published in a book authored by the Reporter (Book 2).

**E.     Evidence Stored in HALE's Home**

39.     On August 8, 2014, HALE possessed Document T on his home computer.  HALE also possessed two thumb drives.  The first thumb drive contained one page of Document A that HALE had attempted to delete.  This page was marked "SECRET."  The second thumb drive contained the "Tor" software and "Tails" operating system.

40.     Tor and Tails were recommended by the Reporter's Online News Outlet in an article published on the Reporter's Online News Outlet's website, which provided readers with instructions on how to anonymously "leak" documents to the Reporter's Online News Outlet. The article published by the Reporter's Online News Outlet explained that the Tor browser allows users to anonymously surf the web by "hiding your real IP address from the websites that you visit.  If your network is being monitored, the eavesdroppers will only know that you are using Tor but not what you're doing."  The article went on to explain that the Tails operating system, which can be installed via a USB stick, will prevent someone who has hacked into your computer from "spy[ing] on everything you do."  It "strip[s] metadata from a variety of types of documents…[and] leaves no traces that it was ever run on your computer."

41.     On or about August 8, 2014, HALE's cell phone contact list included the contact information for the Reporter.

## COUNT 1
### (18 U.S.C. § 793(c)—Obtaining National Defense Information)

THE GRAND JURY FURTHER CHARGES THAT:

42.     The General Allegations within Paragraph 1 through 41 of this Indictment are re-alleged and incorporated by reference.

43.     Beginning on or about February 28, 2014, and continuing to on or about May 14, 2014, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, for the purpose of obtaining information respecting the national defense, unlawfully obtained documents connected with the national defense, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|---|---|---|---|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

knowing and having reason to believe at the time he obtained Documents A-G, I-K, and M that they had been or would be obtained, taken, made, or disposed of by any person contrary to the provisions of Title 18, United States Code, Chapter 37.

(In violation of Title 18, United States Code, Section 793(c).)

## COUNT 2
### (18 U.S.C. § 793(e)—Retention and Transmission of National Defense Information)

THE GRAND JURY FURTHER CHARGES THAT:

44.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

45.     Beginning on or about February 28, 2014, and continuing to on or about . December 17, 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, having unauthorized possession of, access to, and control over the following documents related to the national defense, willfully: (a) retained the documents and failed to deliver them to the officer or employee of the United States entitled to receive them; and (b) communicated, delivered, and transmitted such documents to a person not entitled to receive them.  Specifically, HALE retained the following documents relating to the national defense, and transmitted them to the Reporter and/or the Reporter's Online News Outlet:

| Document | Date Printed | Date of Initial Publication | Classification |
|---|---|---|---|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

(In violation of Title 18, United States Code, Section 793(e).)

## COUNT 3
### (18 U.S.C. § 793(e)—Causing the Communication of National Defense Information)

THE GRAND JURY FURTHER CHARGES THAT:

46.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

47.     Beginning on or about February 28, 2014, and continuing to on or about December 17, 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, having unauthorized possession of, access to, and control over documents related to the national defense of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|----------|--------------|------------------------------|----------------|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| M | May 14, 2014 | August 2014 | SECRET |

did willfully communicate, deliver, transmit and cause to be communicated, delivered, and transmitted, and attempt to communicate, deliver and transmit and cause to be communicated, delivered, and transmitted the same to persons not entitled to receive them, through the publication, dissemination, and distribution to the general public of articles and books concerning Classified Documents A-G, I-K, and M.

(In violation of Title 18, United States Code, Section 793(e).)

14

**COUNT 4**
**(18 U.S.C. § 798(a)(3)—Disclosure of Classified Communication Intelligence Information)**

THE GRAND JURY FURTHER CHARGES THAT:

48.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

49.     Beginning on or about February 28, 2014, and continuing to in or about October 2015, in the Eastern District of Virginia and elsewhere, the defendant, DANIEL EVERETTE HALE, did willfully communicate, furnish, transmit, and otherwise make available to an unauthorized person any classified information concerning the communication intelligence activities of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|---|---|---|---|
| A | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| K | February 28, 2014 | April 2015 | TOP SECRET |

(In violation of Title 18, United States Code, Sections 798(a)(3).)

## COUNT 5
### (18 U.S.C. § 641—Theft of Government Property)

THE GRAND JURY FURTHER CHARGES THAT:

50.     The General Allegations within Paragraph 1 through 41 of this Indictment are incorporated by reference.

51.     Between on or about February 28, 2014, and continuing to in or about December 2016, in the Eastern District of Virginia, and elsewhere, the defendant, DANIEL EVERETTE HALE, did knowingly and unlawfully steal and convert to his own use or the use of another, and without authority, conveyed and disposed of records and things of value of the United States, namely:

| Document | Date Printed | Date of Initial Publication | Classification |
|----------|--------------|------------------------------|----------------|
| A | February 28, 2014 | October 2015 | SECRET |
| B | February 28, 2014 | October 2015 | SECRET |
| C | February 28, 2014 | October 2015 | SECRET |
| D | February 28, 2014 | October 2015 | SECRET |
| E | February 28, 2014 | October 2015 | TOP SECRET |
| F | February 28, 2014 | October 2015 | SECRET |
| G | April 3, 2014 | April 2015 | TOP SECRET |
| I | April 20, 2014 | August 2014 | SECRET |
| J | April 20, 2014 | December 2015 | SECRET |
| K | April 20, 2014 | April 2015 | TOP SECRET |
| L | April 30, 2014 | July 2014 | UNCLASSIFIED |
| M | May 14, 2014 | August 2014 | SECRET |
| N | May 14, 2014 | August 2014 | UNCLASSIFIED |
| O | May 15, 2014 | December 2016 | UNCLASSIFIED |
| P | May 15, 2014 | December 2016 | UNCLASSIFIED |
| Q | May 15, 2014 | December 2016 | UNCLASSIFIED |
| R | May 15, 2014 | December 2016 | UNCLASSIFIED |
| T | June 27, 2014 | N/A | UNCLASSIFIED |

The aggregate value of said records and things of value being more than $1,000.

(All in violation of Title 18, United States Code, Section 641.)

A TRUE BILL:

# UNDER SEAL

FOREPERSON OF THE GRAND JURY

G. Zachary Terwilliger
United States Attorney
Eastern District of Virginia

John C. Demers
Assistant Attorney General
National Security Division
U.S. Department of Justice

Gordon D. Kromberg
Alexander P. Berrang
Assistant United States Attorneys

Heather M. Schmidt
Senior Trial Attorney
Counterintelligence-Export Control Section
National Security Division
U.S. Department of Justice

Exhibit 6



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

September 8, 2021

MR. CHARLES GIBBONS
DEFENDING RIGHTS AND DISSENT
SUITE 500
1325 G STREET NORTHWEST
WASHINGTON, D.C. 20005

NFP Request No.: 130894
Subject: The Drone Papers
(On or After January 1, 2012)

Dear Mr. Gibbons:

This is in response to your Freedom of Information/Privacy Acts (FOIPA) request. Your request is overly broad and it does not comport with the requirements of 28 CFR § 16.3(b), as it does not provide enough detail to enable personnel to locate records "with a reasonable amount of effort." Therefore, your request is being closed.

For questions on how to reasonably describe your request, please email us at foipaquestions@fbi.gov.   You may also visit www.fbi.gov and select "Services," "Information Management," and "Freedom of Information/Privacy Act" for additional guidance.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely

Michael G. Seidel
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Exhibit 7



1325 G St. NW Suite 557 | Washington, DC 20005 | rightsanddissent.org | info@rightsanddissent.org

Nov 29, 2021

I am writing to appeal a determination made that a FOIA request I submitted was "overly broad" and did not contain enough detail to reasonably locate the records. The request was closed out and assigned the number "NFP Request No.: 130894." I am including a copy of the original request.

In August 2014, defense contractor Daniel Hale's home was raided by the Federal Bureau of Investigation as part of an Espionage Act investigation. This investigation, per later Department of Justice press releases, was led by the FBI's Baltimore Field Office. In spite of this raid, no further public actions were taken by the government until May 2019, when the Department of Justice revealed a sealed indictment (dated March 2019). On July 27, 2021, US Air Force Veteran Hale was sentenced to 45 months in prison under the Espionage Act. He is currently held at USP Marion.

On August 27, 2021 I submitted an incredibly detailed, highly descriptive FOIA request about the leak investigation culminating in Hale's prosecution. In addition to containing a lengthy background section complete with footnotes the request contained as an appendix the indictment the investigation produced. After a two page background section, the request described the sought after records in the following manner:

> *We are requesting FBI records created from 2012 to 2021 that mentions or references*
>
> *Leak investigations resulting from the Intercept publishing information about the US terror watch list in July and August 2014.*
>
> *Leak investigations resulting from The Intercept publishing classified information about the US drone program between April 2015 and December 2016*
>
> *The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency.*

*"The Drone Papers" an October 2015 series of articles published by The Intercept*

*The Assassination Complex Inside the Government's Secret Drone Warfare Program, a book published in 2017 based on aforementioned series of articles "The Drone Papers"*

Similarly worded requests were submitted to the National Security Agency, Department of Justice National Security Division, and National Geospatial Intelligence Agency.

On November 1, 2021, with the FBI being the only agency to fail to acknowledge the request, I sent an email to FOIPAQUESTIONS@FBI.GOV inquiring about the request. On November 2, 2021,  I was informed the FBI had electronically sent me correspondence. I could not locate such correspondence in either my email or in the FBI eFOIA portal. On November 5, 2021 I was informed "the FBI has received your additional correspondence regarding your Freedom of Information/Privacy Act (FOIPA) request and it has been forwarded to the assigned analyst for review.   A new copy is forthcoming." Additionally on  November 5, I was informed "Correspondence was placed in the mail yesterday."

A response, dated September 8, 2021, finally arrived by mail on November 8, 2021. The subject was listed as "the drone papers." It was at this point that I was informed the FBI had denied my request as not reasonably describing specific records. I would note that at the time of writing this appeal, none of the other three government agencies who received similarly worded requests have made such claims.

I am appealing this determination. The request reasonably describes the documents sought.


Two of the five bulleted descriptions of the requested records used the phrase "leak investigation," making it clear they sought files from a specific investigation. The existence of this investigation is public knowledge, as it was outlined in an indictment and mentioned in Department of Justice press releases. As the individual ultimately accused of being the whistleblower by the government is currently in federal prison, it is not an active investigation.  A request for files from a specific, publicly acknowledged (and closed) investigation reasonably describes the files requested so that they can be located

The remaining three bulleted descriptions of the requested records that mentioned or referenced publications that were at the heart of a criminal prosecution of a whistleblower. The bullet point that read "The Intercept's publishing of 17 documents printed at the National Geospatial Intelligence Agency" is based on the content of an indictment filed by the US Department of Justice and included as an appendix (the indictment includes a table of the documents). The remaining bullet points concern the name of the article series at the heart of the investigation, as well as the formal name of a book that was mentioned in a plea agreement.

The request specifically asks for documents that mention or reference the requested information.  In a March 17, 2016 opinion a United States District Court for the District of Columbia Judge found requests for records "mentioning" or "referencing" a subject met FOIA's reasonable-description requirement. See Shapiro v. CIA, No. 14-00019, 2016 WL 1069646 (D.D.C. Mar. 17, 2016) (Cooper, J.)

Asking for records that mention a specific article series or a book title known to have been the subject of a leak investigation reasonably describes records that can be located.

The August 24, 2021 request concerns the US government's reaction to the publishing of national defense information. That the US government reacted is known given the FBI carried out a raid of an individual's house and the Department of Justice obtained an indictment and conviction. The request contained a lengthy background section with footnotes to documents created by the US government. One of those documents, an indictment, was included as an appendix. In order to facilitate the ease of which the FBI could locate the documents five bullet points were given describing the requested materials. These bullet points range from describing the requested documents as those that mentioned or referenced a specific investigation to those that mentioned or referenced a specific book that was part of a legal proceeding. Each of these bullet points in isolation from each other reasonably describes that could be located. Yet, taken together it becomes all the more impossible to assert that the requested documents were not reasonably described.

Sincerely,

Chip Gibbons
Policy Director
Defending Rights & Dissent



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*

*441 G Street, NW*

*Washington, DC 20530-0001*

Exhibit 8

*Telephone: (202) 514-3642*

November 29, 2021

chip@rightsanddissent.org

Dear Chip Gibbons:

This is to advise you that the Office of Information Policy (OIP) of the U.S. Department of Justice received your administrative appeal from the action of the FBI regarding Request No. NFP-130894 on 11/29/2021.

In an attempt to afford each appellant equal and impartial treatment, OIP has adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number A-2022-00363 . Please refer to this number in any future communication with OIP regarding this matter. Please note that if you provided an email address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at (202) 514-3642. If you have submitted your appeal through FOIA STAR, you may also check the status of your appeal by logging into your account.

Sincerely,

*Priscilla Jones*

Priscilla Jones
Supervisory Administrative Specialist